**MOTOROLA, INC.**

v.

**HITACHI, LTD.**

Nos. A–89–CA–268, A–89–CA–481.

United States District Court,
W.D. Texas,
Austin Division.

March 29, 1990.

On Motion for Clarification or
Modification April 13, 1990.

Niro, Scavone, Haller & Niro, Ltd., Tom Scavone, Chicago, Ill., Roger H. Dusberger, Schaumburg, Ill., Fish & Neave, Herbert F. Schwarts, Kenneth B. Herman, New York City, and Clark, Thomas, Winters & Newton, Barry Bishop, Austin, Tex., for plaintiff.

Jerold S. Solovy, Donald R. Harris, Barbara S. Steiner, Jenner & Block, Jon O. Nelson, Allegretti & Witcoff, Ltd., Alan Loudermilk, Chicago, Ill., David H. Donaldson, Jr., Graves, Dougherty, Hearon & Moody, Austin, Tex., and W.O. Shafer, Shafer, Davis, McCollum, Ashley, O'Leary & Stoker, Inc., Odessa, Tex., for defendant.

### MEMORANDUM OPINION AND ORDER

BUNTON, Chief Judge.

BEFORE THIS COURT came the parties for trial to the Bench on Plaintiff's claims of patent infringement, breach of contract, fraud and tortious interference and Defendant's counterclaims of tortious interference and patent infringement. The parties tried their suit in three days before the Court and the Court commends counsel for its diligence in narrowing the issues and getting to the heart of the evidence to be presented. While the Court compliments counsel on both sides for their diligence, the Court also notes such conduct is expected of all parties appearing before this Court. With that, the Court now enters its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff, Motorola, Inc. ("Motorola"), is a Delaware corporation headquartered in Schaumburg, Illinois. Defendant Hitachi, Ltd. ("Hitachi") is a Japanese corporation headquartered in Tokyo, Japan. Both Motorola and Hitachi manufacture and sell microprocessors and microcontrollers, among other products. Since 1975, Motorola and Hitachi have entered into a series of agreements concerning their microprocessors and microcontrollers, including agreements to cross-license their respective patents, to share technological advances with each other, and to manufacture each other's devices. (Defendant's Exhibits 21–32.) Such a union is also known as a second-source relationship and is typically initiated at the request of large customers of either corporation.

The dispute before the Court focuses on one of those agreements, the 1986 Patent License Agreement (the "PLA"). Plaintiff's Exhibit 30 and Defendant's Exhibit 177. Under the PLA, Motorola and Hitachi each agreed to license certain of their patents to each other for use in the manufacture and sale of new or improved electronic devices, subject to restrictions specified in the PLA. In this suit, each party alleges the other used its patents to manufacture and sell a device not licensed under the PLA.

### MOTOROLA'S CLAIMS

Motorola's First Amended Verified Complaint, filed on March 28, 1989 (the "Complaint"), requests the following relief:

Count 1: a declaratory judgment that Hitachi's H8/532 microcontroller infringes four Motorola patents: U.S. Patent No. 4,263,650 (the "'650 patent"); U.S. Patent No. 4,255,785 (the "'785 patent"); U.S. Patent No. 4,748,559 (the "'559 patent"); and U.S. Patent No. 4,758,945 (the "'945 patent"), reasonable royalty damages for such infringement, punitive damages and an Order enjoining Hitachi from further infringing those patents;

Count 4: actual damages for Hitachi's breach of the ZTAT Agreement;

Count 6: actual and punitive damages for Hitachi's acts of common law fraud as well as the imposition of a constructive trust on all profits and proceeds received by Hitachi on those sales of microprocessor products that resulted from Hitachi's fraudulent and unlawful scheme to misappropriate Motorola technology and injure Motorola;

Count 7: actual and punitive damages for Hitachi's tortious interference with Motorola's contractual relationships;

Count 8: actual and punitive damages for Hitachi's tortious interference with Motorola's prospective economic advantage;

Count 9: a declaratory judgment that Hitachi's H8 and H16 microcontrollers are not licensed under the PLA.

Counts 2, 3 and 5 no longer fall within this Courts jurisdiction because the parties settled their differences regarding Count 3 and Count 5 was struck from the suit. Further, at trial Motorola did not pursue its Count 2 claims that Hitachi's H16 microprocessor infringed Motorola's '559, '945 and '785 patents, therefore the Court shall not pass judgment on those issues.

### HITACHI'S COUNTERCLAIMS

Hitachi's Second Amended Counterclaim (the "Counterclaim"), filed on October 25, 1989 requests the following relief:

Count 1: actual and punitive damages for unfair competition;

Count 3: actual and punitive damages for tortious interference with prospective business and economic relationships as well as an injunction forbidding further interference with those prospective and economic relationships;

Count 4: a declaratory judgment Hitachi's H8/532 microcontroller is licensed under the 1986 PLA and Motorola breached the PLA;

Count 5: declaratory judgment of Motorola's patent misuse and unfair competition;

Count 6: declaratory judgment of ZTAT contract rights;

Count 7: actual and punitive damages for fraudulent inducement;

Count 8: declaratory judgment of inequitable conduct in the procurement of certain patents;

Count 9: declaratory judgment with regard to the invalidity and non-infringement of certain Motorola patents; and

Count 10: reasonable royalty damages for Motorola's infringement of Hitachi's U.S. Patent No. 4,646,271 (the "'271 patent") by Motorola's MC68030 microprocessor as well as an injunction against Motorola's continued infringement of the '271 patent.

Count 2 of Hitachi's Second Amended Counterclaim was dropped at Hitachi's behest.

The complexity of the case and the multiplicity of issues intimate a separation of the Court's Findings of Fact and Conclusions of Law by subject area. Each claim and counterclaim shall be discussed seriatim unless otherwise consolidated.

### LAW TO BE APPLIED

Initially, the Court must decide whether Illinois or Texas law should be applied to the contract and tort claims championed by each side. Hitachi argues and Motorola agrees Illinois law is pertinent to the disputed ZTAT Agreement and the 1986 Patent License Agreement (the "PLA") because both agreements have identical forum selection provisions choosing Illinois law. As for the tort and fraud claims advanced both by Motorola and by Hitachi, those claims revolve around the negotiations preceding the two contracts. Hitachi argues Illinois law is again applicable, while Motorola claims the laws of the State of Texas should be applied.

■ As this suit was filed in Federal Court in Texas, this Court is bound to apply the Texas conflict of laws doctrine. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Kucel v. Walter E. Heller & Co.*, 813 F.2d

67, 73 (5th Cir.1987). Claims on contracts which include a choice of forum clause are treated somewhat differently than tort claims under the Texas conflict of laws scheme. In the area of contracts, specifically those containing a choice of forum clause, Texas conflicts law holds, "where the parties to a contract specify in the instrument that it is to be governed by the law of a particular state, that law will apply if it has a reasonable relationship to the contract." *Securities Investment Co. v. Finance Acceptance Corp.*, 474 S.W.2d 261, 271 (Tex.Civ.App.—Houston 1971, writ ref'd n.r.e.). This concept is codified in the Texas Business and Commerce Code at Section 1.105(a). Tex.Bus. & Com.Code Ann. § 1.105(a) (Tex. UCC) (Vernon Supp.1980–81)[1]. Thus, there must be a reasonable relationship between the chosen state and the transaction. *Cook v. Frazier*, 765 S.W.2d 546 (Tex.App.—Fort Worth 1989, no writ). Further, there must be no countervailing public policy of the forum (in this case Texas) which demands otherwise. *Aerospatiale Helicopter v. Universal Health Services*, 778 S.W.2d 492 (Tex.App.—Dallas 1989, writ requested). This two-pronged test overrides the general rule that "the law of the state where the contract is made controls with respect to validity, interpretation and obligations under the contract." *First Commerce Realty Investors v. K–F Land Co.*, 617 S.W.2d 806, 809 (Tex.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Aerospatiale, supra.*

■ In the suit *sub judice*, the parties selected Illinois law to control both the ZTAT Agreement and the PLA. Motorola is headquartered in Chicago, Illinois, and parts of the agreements were negotiated in Chicago. No overriding public policy of the State of Texas prohibits the application of Illinois law. These facts establish reasonable contacts with the forum selected and, in this Court's opinion, justify the use of Illinois law as the law governing the validity, interpretation and obligations under the Contract. *See, e.g.: DeSantis v.*

*Wackenhut Corp.*, 732 S.W.2d 29 (Tex. App.—Houston [14th Dist.] 1987, *aff'd in part and rev'd in part on other grounds*, 793 S.W.2d 670 (1990)); *Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20 (Tex.App. —Dallas 1982, writ dism'd w.o.j.).

■■■ As to the tort claims of the parties, Texas courts utilize the "most significant relationship" test for determining which laws should be applied to a given set of facts. This approach is detailed in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws (1971). *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex. 1984). Quality rather than quantity is paramount when applying the test. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979).

The relevant language of the Restatement (Second) of Conflicts (1971), Section 6 holds:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law,

(2) When there is no such directive, the factors relevant to the choice of the applicable rule include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflicts (1971).

Section 145 of the same treatise states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to a particular issue.

Restatement (Second) of Conflicts (1971).

■■■ In the suit *sub judice*, the alleged injury ostensibly occurred in Austin, Texas for the reason that Motorola's microprocessor division is located in Austin and most of the inventors reside in the State of Texas. The technology at issue was designed and developed in Austin and much of the training of Hitachi employees took place in Austin, although the actual execution of the PLA took place in Illinois. Portions of the ZTAT and PLA were negotiated in Austin. Any effect from an alleged infringement would be most strongly felt in Austin where the Motorola employees engaged in the design of microprocessors conduct their work.

The conduct surrounding the allegations took place in Tokyo, Japan where Hitachi designed and developed and sold the microprocessors in question, and in the United States where the microprocessors were also marketed. Further, since the PLA and the ZTAT Agreements were negotiated in both Chicago and Austin (as well as Tokyo, Phoenix and New York City), it could be said that portions of the conduct took place in those cities.

Motorola is a Delaware Corporation headquartered in Chicago, Illinois while Hitachi is Japanese Corporation, headquartered in Tokyo, Japan. Motorola's microprocessor division is located in Austin.

Most importantly, the relationship between the parties, in this case, is centered in Austin, Texas. This suit revolves around the transfer of microprocessor tech-

nology from Motorola to Hitachi. As previously stated, Motorola's microprocessor section is found in Austin, Texas and apparently much of the training afforded Hitachi employees pursuant to the technology transfer took place in Austin, Texas. The devices in dispute are manufactured in Austin, Texas as well as in Tokyo, Japan.

In light of the foregoing, this Court is of the opinion the law appropriate to the tort claims herein is Texas law because the injury, although global in scope, impacts the microprocessor industry which, as between these two parties, is focused in Austin, Texas. Further, the State of Texas will feel any alleged injury most intensely as the inventors and employees involved in the industry reside in Texas, not Chicago, and resulting economic losses will directly affect Motorola's microprocessor division, located in Austin. Therefore, the Court shall apply Texas law to the parties' tort claims.

### THE LANGUAGE OF THE PLA

Initially, Motorola claims the Hitachi H8/532 microcontroller infringes four Motorola patents, namely the '650, the '785, the '559 and the '945 patents and the H8/532 is not licensed under the PLA. (Complaint, Counts 1, 9.) Hitachi countered this claim by producing the operative language of the PLA and arguing the H8/532 was licensed thereunder. (Counterclaim, Count 4.) In the alternative, Hitachi seeks a declaratory judgment of the invalidity of the '650, '785, '559 and '945 patents negating Motorola's infringement claim. (Counterclaim Count 9.)

The relevant language of the PLA, found in section 1.20.5 thereof, states:

1.20 MICROPROCESSOR FAMILY PRODUCTS means ...

1.20.5 Any MICROPROCESSOR capable of executing substantially the same instruction set as a MICROPROCESSOR in any of the [Motorola 6800/68000 microprocessor families].

Defendant's Exhibit 177. It is the meaning of the phrase "instruction set" that is hotly disputed by the parties hereto and is necessarily a springboard for the remainder of the claims and counterclaims regarding the H8/532. In essence, Motorola claims the phrase refers to the "source code" or "assembly code" used by customers of the product to encode particular instructions into a microprocessor and thereby make it perform the function desired by the customer. Hitachi argues it refers to the binary code, object code or machine language understandable by the microcontroller. Object code, binary code and machine language refer to a series of electrical impulses comprehendible by the microprocessor and symbolized by zeroes and ones (010101) or as letters (ABABA) or as electrical impulses (high-low, high-low).

In reading the PLA and the ZTAT, this Court, as previously stated, must look to Illinois law for the appropriate standard. The primary object of a court in construing a contract is to give effect to the intention of the parties. *Martindell v. Lake Shore National Bank,* 15 Ill.2d 272, 283, 154 N.E.2d 683, 689 (1958). Generally the intention of the parties is to be determined from the final agreement executed by them rather than from preliminary negotiations and the construction placed upon the agreement of the parties. *Mid City Industrial Supply Co. v. Horwitz,* 132 Ill. App.3d 476, 482, 87 Ill.Dec. 279, 283, 476 N.E.2d 1271, 1275 (1985); *LaThrop v. Bell Federal Savings and Loan,* 68 Ill.2d 375, 384, 12 Ill.Dec. 565, 569, 370 N.E.2d 188, 192 (1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978). Any ambiguity in the PLA or ZTAT must be construed against the drafter of the language, in this case, Motorola. *Duldulao v. St. Mary of Nazareth Hospital Center,* 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 319 (1987). The mere fact that the parties do not agree upon the meaning of the terms of a contract does not create ambiguity. *L.K. Comstock & Co. v. Morse/UBM Joint Venture,* 153 Ill.App.3d 475, 480, 106 Ill.Dec. 462, 465–6, 505 N.E.2d 1253, 1256–7 (1987).

At trial, the evidence revealed "instruction set" is a phrase standard in the microprocessor industry meaning the source code used by the customer to pro-

gram the microprocessor to his liking. "Instruction set" is defined in the Institute of Electrical and Electronics Engineers ("IEEE") Standard Dictionary of Electrical and Electronics Terms (the "IEEE Dictionary") as "The set of instructions of a computer, of a programming language, of the programming languages in a programming system." IEEE Dictionary at 445. Programming language is defined as "(1) A language used to prepare computer languages.... (2) An artificial language designed to generate or express programs." IEEE Dictionary at p. 690. Digging deeper, "artificial language" refers the reader to "formal language" which is defined as: "A language whose rules are explicitly established prior to its use. Examples include programming language, such as FORTRAN and Ada, and mathematical language such as predicate calculus." IEEE Dictionary at 363.

Another relevant source of definition, submitted by both parties as a trial exhibit is *The Art of Electronics,* second edition, by Paul Horowitz and Winfield Hill (Cambridge University Press, 1989) wherein the authors wrote:

> Programming directly in machine language is extremely tedious, since you wind up dealing with columns of binary numbers, each bit of which has to be bit-perfect, so to speak. For this reason you invariably use a program called an *assembler;* it allows you to write programs using easily remembered mnemonics for the instructions, and symbolic names of your own choosing for memory locations and variables. This *assembly-language* program, really nothing more than a number of cryptic-looking lines of letters and numbers, is massaged by a program called an *assembler* to produce as its output a finished program in machine-language *object code* that the computer can execute. Each line of assembly code gets turned into a few machine-language bytes (1 to 6 bytes, for the 8086). The computer cannot execute assembly language instructions directly. (Emphasis in original.)

*Id.* at 679. Plaintiff's Exhibit 705, Defendant's Exhibit 995. Table 11.1, found on page 746, illustrates an instruction set; which appears to be mnemonics [2], as argued by Motorola.

Another authority filed as a trial exhibit by both parties is *COMPUTER STRUCTURES Principles and Examples* by Daniel P. Siewiorek, C. Gordon Bell and Allen Newell (McGraw–Hill Book Company 1982). Plaintiff's Exhibit 327, Defendant's Exhibit 932. In *COMPUTER STRUCTURES* the following excerpt appears:

> The components of the program level are a set of memories and a set of operations. The memories hold data structures, which represent things both inside and outside the memory, e.g., numbers, payrolls, molecules, and other data structures. The operations take various data structures as inputs and produce new data structures, which again reside in memories. Thus the behavior of the system is the time pattern of data structures held in its memories. The unique feature of the program level is the representation it provides for combining components, that is, for specifying what operations are to be executed on what data structures. This is the program, which consists of a sequence of instructions. Each instruction specifies that a given operation (or operations) be executed on specified data structures. Superimposed on this is a control structure that specifies which instruction is to be interpreted next. Normally this is done in the order in which the instructions are given, with jumps out of sequence specified by branch instructions. * * *
>
> Two things separate the logic level from the program level. First, computer systems at the logic level are parallel devices, with all components active at the same time. At the program level, computers are represented essentially as serial devices, executing one instruction after another. Second, the program level

---

**2.** The Court does not suggest trying to pronounce this word with peanut butter in the mouth.

is essentially linguistic in nature; the logic level is not. At the program level things can be named, abbreviations used, decisions made, instructions interpreted—all concepts that are absent from physical systems. Of course, they are not *really* absent, since a full description of the operation of a program is possible at the logic level. This is done by applying the set of physical behaviors that makes computers show the appropriate linguistic behavior at the program level. Thus, instead of the instruction "go to ALPHA if register zero is negative," there is a logic circuit that transfers the contents of the address field of the instruction register to the program counter, ANDing that transfer with the sign of register zero so that it takes place only if the register is negative. This example reveals the distinct system boundary between the register-transfer level and the program level. The gap between these levels is also revealed in the ability of programmers to become expert without knowing anything about representations below the programming level.

The program level constitutes an entire technology in its own right, carrying within it most of the characteristics of computer systems. The ISP (instruction-set processor) sublevel specifies the machine's instruction interpretation cycle: instruction fetch, instruction decode, program counter update, operand address calculation, operand fetch, and instruction execution.

The ISP description system is meant to provide a uniform way of describing instruction sets, i.e., of giving the information contained in a programming manual. It must provide the instruction format, the registers referenced by the instructions, the rules of interpretation of the instructions, and the semantics of each instruction in the processor's repertoire. It must be able to do this for any existing computer and for any anticipated future computer. (Emphasis in original.) *Id.* at pp. 13–14. One final authority, at the risk of verbosity, is *An Introduction*

*to Microcomputers,* Volume 1, Second Edition by Adam Osborn (McGraw Hill 1980) wherein the author, in defining a "program" states: "Instruction codes are input to the CPU as a means of identifying the next operation you want the CPU to perform. A sequence of instruction codes, stored in memory, constitutes a program." *Id.* at p. 4–1. These authorities, in addition to the testimony at trial, persuade the Court the phrase "instruction set" is an accepted industry standard referring to the mnemonics used by the programmer, as opposed to the binary code understood by the microprocessor.

The fact that the PLA uses the word "executing," which Hitachi argues denotes binary code, does not, in this Court's opinion, render the PLA ambiguous. Although the computer translates the mnemonic instruction set to binary before it can carry out the user's commands, it is, nevertheless, executing the user's intentions. All computers break down the programming language into the digestible binary code, but this process does not change the fact that an instruction set is a set of mnemonics, nor that the computer executes the instruction set, only by way of binary. Thus, it is the finding of this Court the "instruction set" is the set of mnemonics used by Motorola in its 6800 and 68000 microprocessor families.

### THE H8/532 AND LICENSE UNDER THE PLA

The next question this Court must address is whether the H8/532 is licensed under the PLA. By law, the owner of a patent may license others to "perform acts which if performed without his consent would constitute contributory infringement of the patent." 35 U.S.C. § 271(d)(2). Plaintiff seeks a declaratory judgment, under Count 9 of its First Amended Complaint, that Hitachi's H8 and H16 are not licensed under the PLA.

Testimony of Dr. Federico Faggin revealed his comparison of the H8/532 with

Motorola's 6800 and 6801 microprocessors.[3] Dr. Faggin testified that only four instructions of the 200 included in the 6800 were not substantially the same or equivalent to instructions in the H8/532. Of the 35 additional instructions of the 6801 over the 6800, all are outside the instructions included in the H8/532. Additionally, the Hitachi 6301 contains some 9 instructions in excess of those found in the 6801, all of which are outside the scope of the H8/532.[4] In general, however, the H8/532 is capable of executing more than ¾ of the instruction sets of the 6800, 6801 and 6301. Each of the Motorola chips are upward source code compatible with one another, meaning the customer who originally purchased the 6800 can move up to the more complex 6801 or 6301 without having to repurchase or change software. The 6801 computer can read the software originally designed for the 6800 as well as any newly designed 6801 software, and the customer can take advantage of innovation without major cost to overhaul its software. Likewise, the 6301 is upward source code compatible with the 6800 and 6801. (Thus, the phrase "family of products.")[5]

It was the intention of Motorola and Hitachi, in executing the PLA, to preserve the typical customer loyalty which develops when customers of a line of products make large investments in software and need only update such software upon the announcement of innovations. Competing products which are upward source code compatible allow customers to buy into a competitor's products without having to replace their existing software. Because the H8/532 is upward source code compatible with the Motorola 6800 family, Hitachi ostensibly reaped a tremendous marketing benefit with those customers owning the 6800 family software as opposed to introducing a microprocessor which was not upward source code compatible with the 6800.

For reasons stated hereinabove, the Court finds the Hitachi H8/532 does in fact execute substantially the same instruction set as the Motorola 6800 family and is not licensed under the PLA.

### H8/532 INFRINGEMENT CLAIM

Motorola argues that Hitachi infringed four Motorola patents: the '650 patent, the '785 patent, the '559 patent and the '945 patent. Each will be discussed in turn.

*A. The H8/532 v. the '650 Patent* [6]

Motorola's '650 Patent, filed on October 30, 1974, relates to a microprocessor peripheral interface adaptor ("PIA") which allows a microprocessor-based system to efficiently connect to any number of external peripheral devices, such as CRTs, printers, keyboards, etc. Hitachi counters Motorola's '650 infringement claim with the

---

**3.** Dr. Faggin was one of the designers of the first microprocessor (the Intel 4004), the designer of the first 8-bit microprocessor (the Intel 8008), and a designer of the first high performance microprocessor (the Intel 8080).

**4.** The 6301 was designed by Hitachi in the early 1980s. Motorola disputed the licensing of the 6301, believing the 6301 to be a derivative of the Motorola 6801, but found its arguments academic in light of the fact that many customers had already designed the 6301 into their software. Motorola therefore "allowed" the 6301 to be marketed without dispute, although it disagreed the 6301 was an independent product.

**5.** The Court laments the fact that in this day and age many children are not upward source code compatible with their parents or grandparents. Perhaps future Motorola or Hitachi microprocessors will remedy the situation.

**6.** Before the presentation of evidence at trial, the Court took up Hitachi's Motion in Limine regarding Motorola's claim Hitachi's H16 device

infringes the '650 patent. At that time, the Court overruled the Motion, choosing to carry the Motion with trial for ruling after the evidence came forth. As pointed out by Hitachi, this claim is not contained in Motorola's First Amended Complaint. Further, the H16 infringement of the '650 patent is the subject of a currently pending suit, case no. A–90–CA–15, *Motorola, Inc. v. Hitachi, Ltd.* Hitachi conducted no discovery on the issue, despite Motorola's contention that it came under the rubric of the ZTAT breach claim. This Court is of the opinion the Breach of the ZTAT claim does not specify the H16 microcontroller and therefore this Court's findings on an issue not properly discovered would be prejudicial to Hitachi. For these reasons, the Court shall not pass on the issue of the H16 infringement of the '650 patent, but instead shall save it for that rainy day in the future when the Court has nothing better to do than listen to these two parties' continuous stream of grievances against each other.

argument the '650 patent was preempted by prior art in the form of Digital Equipment Corporation's ("DEC's") PDP–11 computer, TC–11 interface for the PDP–11, and the Cohen Patent assigned to DEC. Defendant's Exhibit 990.

The evidence at trial reflected Motorola's argument that the TC–11 was designed for a minicomputer, a device much larger than the microcomputer for which the '650 patent was designed. The description and claims of the '650 patent do not, however, reflect the patent was specifically designed for microprocessors or for "chips." Plaintiff's Exhibit 268. Instead the '650 refers to data processing systems. Further, the '650 patent does not describe how the technology therein can be put on a chip or specifically designed to microprocessor size. Testimony from one of the inventors of the '650 patent, Mr. Michael Frederick Wiles, revealed the PDP–11 handbook, among other minicomputer handbooks, was used as a reference in the design of the Motorola 6820 microcomputer, which subsumes the '650 technology, including the "Branch Never" instruction found in the '650. As the 6820 project developed more details, however, the PDP–11 PIA technology was eventually left behind. Transcript at 1090. After the 6820 microcontroller project was complete, Motorola patent attorneys prepared and submitted the documentation behind what eventually became the '650 patent. Transcript at 1091. Although those attorneys knew the PDP–11 and other minicomputer handbooks had been utilized in the groundwork for the patent, no reference was made thereto in the '650 patent. Plaintiff's Exhibit 268, Transcript at 1091.

At trial, counsel for Hitachi presented an edition of EDN, an electronics designer's magazine, dated November 20, 1974. Defendant's Exhibit 682. Counsel directed the Court's attention to page 87, which is an article about the Motorola 6820 microcomputer and specifically page 89, which shows the following quote: "But the 6800 goes further than the 8080 towards simplicity, because it also doesn't need external latches to hold status information. This is due to the way that the 6800 follows

PDP–11 architecture, treating all externals as memory." Defendant's Exhibit 682.

Under patent law, the claims found within a patent are presumed valid. 35 U.S.C. § 282. Invalidity must be shown by clear and convincing evidence. *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1578 (Fed.Cir.1984). Production of prior art not considered by the Patent Office in granting the patent eliminates, or, at least reduces, the deference typically due evidence considered by the Patent and Trademark Office. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Any item brought forward as prior art must have been patented or described in a printed publication or in public use or on sale in this country more than one year prior to the date of application for patent in the United States. 35 U.S.C. § 102(b).

The Court finds the PDP–11 and the TC–11 interface clear and convincing evidence of prior art. The PDP–11 was used in the original formation of the Motorola 6820 microcomputer, and contains the same technology found in the '650 patent. Defendant's Exhibit 990. The fact that the '650 was designed around the microcomputer as opposed to the minicomputer does not persuade the Court otherwise as microcomputer specifications are not included in the '650 patent and because the computer industry is forever striving toward making the current technology smaller. Further, the TC–11 DECtape was on sale in the United States before October 30, 1973, one year preceding the filing date of the '650 patent. *See:* Defendant's Exhibit 469, p. ii (PDP–11 handbook, copyrighted 1971), pp. 33–34 (TC–11 DECtape sold at time handbook printed); Defendant's Exhibits 469, 662, 663, 1096.

Hitachi also tendered the Cohen patent as prior art tending to invalidate the '650 patent. The Cohen patent was filed on April 1, 1970 and awarded on January 9, 1973, making it over one year older than the '650 patent. Further, the Cohen patent was not considered by the Patent and

Trade Office in awarding the '650 patent. Plaintiff's Exhibit 268. This Court finds the Cohen patent anticipated the '650 patent because it contained the key elements found in the '650, namely a processing system for executing multiple instructions in response to the execution of the first of the set of instructions, a bidirectional bus, a memory means coupled to the processor by way of the bidirectional bus, a peripheral data bus, an adaptor means coupled between the peripheral bus and the bidirectional bus to transmit information between the peripheral bus and the digital data processing system, a control register, an interface means, etc. *See:* Defendant's Exhibit 685. For these reasons, the Court is of the opinion the '650 Patent is invalid due to prior art.

 In the alternative, the Court is of the opinion even if the '650 patent is valid, the H8/532 does not infringe the patent. As Dr. Strader testified, the H8/532 is based on CMOS circuitry whereas the '650 patent teaches NMOS in-channel MOS circuitry. Transcript at 313. Further, the claims in the '650 require a processor for executing instructions but the H8 uses microprogramming to execute instructions. Transcript at 313. Thus, this Court finds in the alternative the '650 patent is not infringed by Hitachi's H8/532 microprocessor.

## B. The H8/532 v. the '785 Patent

The '785 patent embodies technology directed to a microprocessor which "fetches" and "executes" consecutive instructions in an overlapping manner, as opposed to one command, then another, and so on. As such, the '785 patent allows for more rapid and efficient execution of the string of commands which comprise a computer program.

 Hitachi's defense to the '785 infringement claim was again prior art in the form of "the Osborn Book" (Plaintiff's Exhibit 275), the Intel 8748 and 8048 microprocessors and the Motorola 67002 nanocomputer. The '785 patent reveals the Osborn Book, pp. 6–18, 6–19, was cited as an "other publication" to the Patent and Trademark Office (the "PTO"). Prior art considered by the PTO examiners is accorded the deference due

> to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*American Hoist,* at 1359. The Osborn Book describes the circuitry of the Intel 8048 and 8748 microcomputers. Hitachi produced Mr. Leroy Prohofsky as a witness with regard to the '785 infringement claim. Mr. Prohofsky was tutored by Mr. Alan Goodman, one of the designers of the Intel 8048. Transcript at 996. However, Mr. Prohofsky disagreed with Mr. Goodman regarding how the Intel 8048 works. Transcript at 997. In fact, Mr. Goodman declined to aid Mr. Prohofsky in the formulation of his testimony due to their differences of opinion as to the way in which the 8048 works. Transcript at 998. This Court finds it significant that one of the designers of the Intel device, claimed to be prior art by Hitachi, did not, in essence, agree the 8048 constituted prior art. Further, the testimony of Gary McCormick conflicted with that of Mr. Prohofsky. With regard to the Motorola nanocomputer, the Court finds the testimony presented by Mr. Prohofsky is not credible in light of his failure to show a clear understanding of the '785 patent. The facts underlying claimed anticipation of a patent must present clear and convincing evidence. *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135 (Fed.Cir.1986). The teaching cannot be vague. *W.L. Gore & Assoc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed. Cir.1983). In the suit at bar, this Court is of the opinion Defendant did not carry its burden of producing clear and convincing evidence of prior art for the reasons stated above.

 Turning then to the question of infringement, this Court is of the opinion the Hitachi H8/532 did indeed infringe the Motorola '785 patent. Plaintiff's Exhibit

621 breaks out the relevant operations of the H8/532 showing the technology for overlap instruction execution in the Hitachi H8/532. Transcript at 293. The fact that the H8/532 uses the more efficient combination of regular logic and random logic (microprogramming) does not distract from the underlying fact that the H8/532 uses the instruction overlap taught in the '785 patent. Although the Court is of the opinion the H8/532 improves upon the concepts taught in the '785 patent, the Court finds the '785 patent is infringed in that its teachings are utilized without license by the H8/532.

*C. The H8/532 v. the '559 and '945 Patents*

■■■ Motorola refers to its '559 and '945 patents as the "power-down" patents, devices which shut off the power to a battery operated machine automatically, thereby producing a substantial saving of energy. Another way of expressing the concept is the "watchdog timer," whereby the circuitry is "put to sleep" when not in use, and, upon the appropriate watchdog signal, awakened and warmed up to efficiently carry out the incoming command. Both the '559 and the '945 patents are titled "Apparatus for Reducing Power Consumed by a Static Microprocessor."

Again, Hitachi's initial defense against Motorola's infringement claim is the '559 and '945 patents are anticipated by the Model 633 cassette recorder, the VACM device and the TDR–1. The VACM is an oceanographic instrument called a "cartometer." According to Hitachi's witness Mr. Winfield Hill, the cartometer is used to measure the flow of water past the cartometer, which is held at a fixed spot in the water. The cartometer then records how much water flowed in a northerly direction and how much in an easterly direction as it passed ·the cartometer. Transcript at 1021–22. The VACM is not a microprocessor. Transcript at 1063. Further, the Court notes the PTO, in ruling on an appeal from the Patent Examiner's finding that the '559 claims were obvious, found

> Here, with respect to the rejection of claims 1, 3, 8, 9, and 10, we see no need

of recourse by one of ordinary skill in the art of appellant's disclosure for direction to inhibit clock signals using latches and logic circuitry in response to decoded software instructions for the purpose of conserving power as broadly claimed. The references considered collectively clearly indicate that it was known and within the ambit of the level of ordinary skill in the art to provide decoded pulses for inhibiting circuit operations to conserve power by either handwired techniques or software techniques.

> Claims 4, 14, 15 and 16 require, in addition to circuitry for inhibiting the clock signals from the master oscillator, a logic means coupled to the first latching means for disabling the generation of the clock signals by the master clock oscillator. Neither the additional function nor the claimed circuitry are found in the cited references. The examiner has therefore presented no evidence in support of his conclusions that the claimed subject matter would have been obvious. The Section 103 rejection of these claims cannot stand.

Defendant's Exhibit 656, at page 88 (document # 16 of the '559 appellate record). *See also:* Defendant's Exhibit 657, at page 90 (document # 19 of '945 appellate record). As the inventions in the '559 and '945 patents relate specifically to microprocessors, the Court is of the opinion the VACM is not an anticipatory device.

The 633 cassette recorder is a recording device designed for use with microprocessors. It is a digital computing system with storage used with instruments of low power circuit design. Transcript at 1026. The schematics of the 633 were unavailable at trial because the company purchasing Sea Data, Mr. Hill's company, destroyed them. Transcript at 1074. Thus, this Court is of the opinion Hitachi did not produce sufficient evidence the 633 cassette recorder anticipates the '559 and '945 patents.

The TR–1 or TDR–1 instruments (or microloggers) are temperature depth recorders designed by Mr. Hill. They are used to take tide measurements, temperature measurements and water level measurements.

Mr. Hill testified as to the TR–1, in lowering the voltage to a level of three volts the oscillator did not always go off as it was designed to do, however. Transcript at 1075. This Court finds such evidence relevant to the question of anticipation. It is this Court's opinion the TR–1 did not anticipate the full logic of the '559 and '945 patents and therefore, the Court is of the opinion Defendants did not meet their burden with respect to showing prior art.

 Turning, to Motorola's claim of infringement, Hitachi again demonstrated for the Court how it improved on the watchdog timer by allowing the user of the H8/532 to program the timer to suit his fancy, and by the use of the more efficient microprogramming. As earlier set forth in this Court's discussion of the '785 patent, the Court finds that the use of the timer in the H8/532 patent was unlicensed and thereby infringing, regardless of any improvements made thereto by Hitachi.

## BREACH OF THE ZTAT AGREEMENT

 Motorola's breach of contract (Count 4) claim and Hitachi's Count 6 declaratory judgment claim center around the ZTAT Agreement entered by Motorola and Hitachi in November of 1987. Plaintiff's Exhibit 31. The ZTAT Agreement was executed by the parties because Motorola believed the microprocessor introduced into the market by Hitachi which included the "Zero Turn Around Time" ("ZTAT") feature was an unlicensed derivative of the Motorola 6800 family microprocessors. Thus, in exchange for Hitachi's withdrawal of the "ZTAT Microprocessor" from the market and a license to Motorola for the device, Motorola agreed to offer a limited license to Hitachi during the withdrawal period. Section 2.7 of the ZTAT Agreement states as follows:

2.7 HITACHI agrees not to manufacture, use lease, sell or otherwise dispose of any microprocessor based device which is designed using any previously transferred TECHNICAL INFORMA-

TION OF MOTOROLA or which falls under the definition of MICROPROCESSOR FAMILY PRODUCTS as stipulated in paragraph 1.20 of the Patent License Agreement dated May 6, 1986 between the parties and which infringes a MOTOROLA PATENT and which is not licensed under this or any other agreement between the parties without first giving notice to MOTOROLA of such intended manufacture, lease, sale, or other disposition and without receiving formal approval in writing from MOTOROLA for such action.

Plaintiff's Exhibit 31 at p. 5.

Motorola, in Count Four of its First Amended Complaint, claims Hitachi breached the ZTAT Agreement by designing, developing, manufacturing and selling the H8/532 and the H16 because the Hitachi H8 and H16 series infringe Motorola Patents and are not licensed under the PLA.

At trial, counsel for Hitachi pointed out that any unfair competition claims, including misappropriation and fraudulent usurpation of technology claims, were struck from Motorola's pleadings and as such, should not be allowed in under the breach of the ZTAT Agreement claim. This Court agrees. The unfair competition claims having been struck, the parties discontinued discovery on those issues. As the ZTAT Agreement is capable of harboring any number of different claims, the Plaintiff can easily slide its unfair competition in under the ZTAT's auspices. Allowing such maneuvering would be prejudicial to the Defendant and an unfair ambush under the circumstances.[7] Thus, this Court shall consider Motorola's Count Four only in the context of patent infringement and licensing under the PLA.

The test under Illinois law for breach of contract is set forth in *Allstate Insurance Co. v. Winnebago County Fair Association, Inc.*, 131 Ill.App.3d 225, 233, 86 Ill. Dec. 233, 239, 475 N.E.2d 230, 236 (1985) as follows: the Plaintiff must show (1) the existence of a valid and enforceable con-

---

**7.** The Court realizes counsel for both sides are largely from Chicago and, being Yankees, may not know that trial by ambush has been out- lawed in Texas, the penalty therefor being hanging.

tract; (2) the performance of the Contract by the Plaintiff; (3) the breach of the Contract by the Defendant; and (4) a resulting injury to the Plaintiff. Defendant does not dispute the existence, validity or enforceability of the ZTAT Agreement nor does Hitachi advance a claim that Motorola also breached the ZTAT Agreement. Thus, it is the issue of Hitachi's breach upon which the Court must place its full attention in ruling upon Count 4 of Motorola's First Amended Complaint and Count 6 of Hitachi's Second Amended Counterclaim.

Under Illinois law, a Defendant's failure to comply with the duty imposed by the Contract gives rise to a breach of the contract. *Hanson v. Duffy*, 106 Ill.App.3d 727, 732, 62 Ill.Dec. 401, 406, 435 N.E.2d 1373, 1378 (1982) [*quoting: Leazzo v. Dunham*, 95 Ill.App.3d 847, 850, 51 Ill.Dec. 437, 440, 420 N.E.2d 851, 854 (1981)]. As this Court previously found, the H8/532 is not licensed under the 1986 PLA because it executes substantially the same instruction set and it infringes Motorola's '785, '559 and '945 patents, in direct conflict with the ZTAT Agreement. Yet this Court is not persuaded that Hitachi understood its design and marketing of the H8 to be in breach of the PLA because of the conflict in the parties' interpretation of the language of the PLA. Thus, the Court is of the opinion equity would not be served by a finding of breach of contract under the circumstances.

## MOTOROLA'S FRAUD CLAIM AGAINST HITACHI

Count 6 of Motorola's First Amended Complaint charges common law fraud against Hitachi. Specifically, Motorola claims Hitachi knowingly and intentionally (1) failed to disclose material facts with respect to the PLA (i.e. the fact Hitachi was in the process of developing microcontrollers not licensed under the PLA), (2) falsely promised in the ZTAT Agreement not to manufacture, use, or sell unlicensed Motorola patented technology, and (3) made misrepresentations and false promises regarding the marketing of both the H8 and the H16 microprocessors relating to the infringement issues discussed above.

Motorola also claims these actions were part of a scheme intended to induce Motorola's reliance upon Hitachi's misrepresentations and Motorola did rely upon them to its detriment. As previously set out, this Court will not take up the issue of the H16 because Hitachi was not given sufficient notice of Motorola's claims against the H16 pursuant to Motorola's Count 6.

■ The test for a finding of common law fraud in Texas is set forth in the Texas Supreme Court case of *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983) wherein the following elements were defined: (1) a material representation was made; (2) it was false; (3) when the speaker made it, he knew it was false or he made it recklessly without any knowledge of its truth and as a positive assertion; (4) he made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) he suffered injury as a result. *Trenholm*, at 930. The burden is upon the party claiming fraud to prove each of the elements by a preponderance of the evidence. *Olney Savings & Loan Association v. Trinity Banc Savings Association*, 885 F.2d 266, 271 (5th Cir.1989); *Fossier v. Morgan*, 474 S.W.2d 801, 803 (Tex.Civ.App.—Houston [1st Dist.] 1971, no writ).

Common law fraud includes both "actual" fraud (intentional breaches of duty designed to injure another or obtain an undue and unconscientious advantage), *Price v. D'Yarmett*, 27 S.W.2d 616 (Tex.Civ.App. 1930, writ ref'd), and "constructive" fraud (those breaches the law condemns as "fraudulent" merely because they tend to deceive others, violate confidences, or cause injury to public interests, the actor's mental state being immaterial), *Archer v. Griffith*, 390 S.W.2d 735 (Tex.1965). *See also: Chien v. Chen*, 759 S.W.2d 484 (Tex. App.—Austin 1988, no writ). Motorola's fraud claims center upon non-disclosure, namely Hitachi's reticence about disclosing the marketing of the H8/532.

■ In Texas, fraud by non-disclosure arises only in those situations where a fiduciary duty is placed upon the party

perpetrating the alleged fraud and a duty to disclose exists. *Southwest E & T Suppliers, Inc. v. American Enka Corp.*, 463 F.2d 1165, 1166 (5th Cir.1972); *Lang v. Lee*, 777 S.W.2d 158, 163–4 (Tex.App.—Dallas 1989, no writ). Fiduciary duty may arise by statute, contract or trust. *Chien v. Chen*, 759 S.W.2d 484, 494 fn. 6. The word "trust" actually refers to a precise relationship wherein "a person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another." *Id.* [*citing:* 1 Bogert, *Trusts and Trustees*, § 1, 1–2 (2d ed. 1984)]. The term fiduciary, however, does not apply solely to those situations wherein a "trust" exists, but also where "the law demands an unusually high standard of ethical or moral conduct with reference to one another." *Id.*

In the suit at bar, the Court is of the opinion a fiduciary relationship in fact exists between Motorola and Hitachi, both parties acting as fiduciaries to the other. The reason for this is the unique circumstances in which the parties find themselves. The microprocessor industry is highly technical, in a constant state of flux and worth millions, if not billions, of dollars in profit to the entity which can invent the fastest, most efficient and productive device. The constant stress and competition of those in the microprocessor race is staggering. Customers are acutely aware of the speed with which a product appears upon the market and, just as suddenly, becomes obsolete in the face of improving technology. The threat of a company's becoming defunct or bankrupt through loss of market share is equally present. Therefore, Motorola's customers required Motorola to second-source its products to ensure a supplier should Motorola's fortunes change. Thus, the relationship between Motorola and Hitachi was born and both companies began training each other's employees in the highly-secretive designs of their products. Each company is intimately aware of and responsible for the life blood of the other. Each party holds the garish key to market destruction of the other, as well as the golden key to increasing market share through the bond between the companies. In a very literal sense, united, Motorola and Hitachi stand; divided, they fall. For these reasons, the Court sees no alternative but to attach a fiduciary relationship to the dealings of these two parties to each other.

Turning then to the first element of common law fraud, a material representation made by Hitachi to Motorola (or, in this case, Hitachi's failure to disclose the development and marketing of the H8/532), the Court is of the opinion Motorola was aware of the H8 prior to the signing of the ZTAT Agreement in November of 1987 and prior to at least one of the meetings regarding the ZTAT Agreement. *See:* Defendant's Exhibit 111 (H. Wakamatsu's fax of June 12, 1987 to Gary Daniels, corporate vice-president for Motorola, wherein Wakamatsu states: "Hitachi will introduce H8 series late '87 to market. His (sic) intention is that (sic) coming down from 16–bit MPU to 8–bit."), Defendant's Exhibit 112 (Wakamatsu fax of June 16, 1987 to Gary Daniels with same message as found in Defendant's Exhibit 111); Defendant's Exhibit 124 (Fax of August 3, 1987 to, *inter alia* Gary Daniels from Theresa Chai which states: "Hitachi's H8/310 MCU for IC card. Hitachi has very recently presented very rough figures of the new MCU for IC card on its pamphlet. * * * I expect the formal announcement of this MCU to public will be done soon. Note: H8XXX series MCUs are Hitachi's original core version MCUs. There are two types of H8XXX. One is the H8/5YY series, Internal 16 bit configuration, higher performance than our 'HC11.' "). Although Gary Daniels testified Defendant's Exhibits 111 and 112 were sent with respect to worldwide strategy meeting and not in regard to the ZTAT negotiations, the Court is of the opinion Motorola was aware of the H8 series prior to the execut of the ZTAT Agreement, and therefore the Court is of the opinion the H8 was not completely covert by action of Hitachi. Even if Motorola did not understand the full impact and design logic of the H8, nevertheless, Motorola was not blind to the fact the H8 was forthcoming. That the H8 was unlicensed under the PLA is, in this

Court's opinion, not dispositive of the issue as the parties persisted in their differences of opinion regarding the crucial language of the PLA. It is this Court's opinion, from the testimony at trial, Hitachi believed the H8 *was* licensed under the PLA. Thus, elements (2)–(4) of Motorola's fraud claim fail because it is the finding of this Court Hitachi did not intend to keep its H8 technology secret from Motorola with the knowledge the H8 was not licensed or with the intention or reckless disregard of injuring Motorola. This Court concludes the initial elements of Motorola's fraud claim were not proven, and Motorola can not recover on that claim.

## MOTOROLA'S TORTIOUS INTERFERENCE CLAIMS

■ Counts 7 and 8 of Motorola's First Amended Complaint allege Hitachi intentionally induced Motorola customers to cease their dealings with Motorola by asserting Motorola products wrongfully infringe the Hitachi '337 patent and by introducing into the market Hitachi products based on misappropriated Motorola patented and proprietary technology, thereby tortiously interfering with contracts and prospective economic advantage. The parties settled their differences with regard to the Hitachi '337 patent, and therefore the Court need not address it. Instead, the Court turns to the tortious interference claims with regard to the Motorola patents infringed by Hitachi's H8 series.

The elements essential to a tortious interference claim in Texas, include (1) the defendant intentionally and maliciously interfered with the contractual or prospective business relationship; (2) without legal justification or excuse; (3) such intentional act was a proximate cause of the plaintiff's damages, and (4) actual damages or loss occurred. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105 (Tex.1984); *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex.Civ.App.— El Paso 1977, writ ref'd n.r.e.). Malice is interpreted as "an act without excuse or just cause." *Sakowitz*, at 107. It is well settled under Texas law that "interference with another's business relations with a third party is actionable only if the interfer-

ence is motivated by malice and no useful purpose of the inducing party is subserved." *Morris v. Jordan Financial Corporation*, 564 S.W.2d 180, 184 (Tex.Civ. App.—Tyler 1978, writ ref'd n.r.e.) [*citing Delz v. Winfree*, 80 Tex. 400, 16 S.W. 111 (1891); *Davis v. Lewis*, 487 S.W.2d 411 (Tex.Civ.App.—Amarillo 1972, no writ)]. *See also: Sakowitz* at 107; *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 91 (Tex.1976). Texas also recognizes a privilege to interfere with a contract or with ongoing business relations when the party accused of the tort in good faith asserted or properly threatened to protect a legally protectable interest of its own which it believed might otherwise be impaired or destroyed by the performance of the contract or transaction. *Morris*, at 184 [*citing:* Restatement of the Law of Torts, § 773].

The crux of Motorola's tortious interference claims appears to the Court to center around the Canon camera design-in loss. Canon was a Motorola customer but switched to the H8 microprocessor when Hitachi introduced it into the market. The Court is of the opinion Canon selected the H8 over the Motorola 68HC11 (the "Koi") for many reasons, one of which being the H8 is a 16–bit microprocessor, whereas the 68000 family is a 32–bit microprocessor. At the present time, Motorola does not have a 16–bit microprocessor. The Court finds Canon selected the H8 for the reason it most accurately fulfilled Canon's needs, not for the reason Hitachi intentionally and maliciously interfered with Motorola's customer base. Hitachi had a product which filled a gap in Motorola's line of products, and Canon took advantage of it. *See:* Transcript at 200, 694–5, 866. Further, as this Court previously held, the Court is of the opinion Hitachi believed its H8 product was licensed under the PLA. Accordingly, this Court declines to find tortious interference on the part of Hitachi of either Motorola contracts or of prospective Motorola economic advantages.

## HITACHI'S PATENT MISUSE/UNFAIR COMPETITION CLAIMS

Counts 2 and 5 of Hitachi's Second Amended Complaint evince claims of unfair

competition and patent misuse. Specifically, Count 5 states: "Motorola's acts and its interpretation of the 1986 PLA would prevent Hitachi from designing and developing any new products or improvements which perform substantially the same or similar functions as or that compete with Motorola products. These acts constitute an unlawful extension of Motorola's patent grants to include rights within the public domain, resulting in the suppression of legitimate competition. The foregoing acts also constitute patent misuse and unfair competition and render all patents licensed by Motorola under the 1986 PLA unenforceable." In view of this Court's previous finding the H8 is not licensed under the PLA, this Court is of the opinion Hitachi's unfair competition claims based upon the PLA are untenable and the Court shall not grant relief to Hitachi on that basis.

## HITACHI'S TORTIOUS INTERFERENCE CLAIM

Count 2 of Hitachi's Second Amended Counterclaim asserts that Motorola's infringement claim, made public, constituted tortious interference with Hitachi's prospective business and economic relationships since Motorola knew its patents were invalid and unenforceable. As this Court previously found the H8 infringed three of the four claimed patents, the Court finds Count 2 of Hitachi's counterclaim groundless.

## HITACHI'S FRAUDULENT INDUCEMENT/INEQUITABLE CONDUCT CLAIMS

Hitachi also claims, in Counts 7 and 8 of its Second Amended Complaint, Motorola intentionally and maliciously made false statements and representations to Hitachi to induce Hitachi's execution of the PLA and ZTAT Agreements, with no intention of performing its promises and Motorola intentionally failed to disclose material and invalidating prior art to the U.S. Patent Office on Motorola's '650 and '785 patents. Hitachi did not pursue these arguments at

trial, however, and the Court shall refrain from passing judgment on the issues.

## THE MC68030 INFRINGEMENT CLAIM

 Count 10 of Hitachi's Second Amended Counterclaim alleges patent infringement of Hitachi's U.S. Patent No. 4,646,271 (the '271 patent) by Motorola's 68000 (or MC68000) family of microprocessors, specifically, the MC68030 microprocessor. The '271 patent, filed on December 19, 1984 and issued on February 24, 1987, teaches a special purpose memory device which has a content addressable memory ("CAM") array, a random access memory ("RAM") array and interconnecting logic between those two memory arrays. Transcript at 1134. The interconnecting logic of the '271 includes a means responsive to a control signal for selecting between two ways of connecting the CAM and RAM arrays to each other, and thus switches between two modes of operation. Transcript at 1139. Hitachi has yet to implement the '271 in a marketable device.

Motorola challenges the validity of the '271 with the Sperry Rand patent (U.S. Patent No. 4,084,225), which was filed on September 24, 1976 and issued on April 11, 1978. Dr. Pooch testified, however, that the Sperry Rand patent can never address anything in the RAM array without doing a match in the CAM array. Transcript at 1189–90. Indeed, the ability to access either the CAM array or the RAM array is the ingenuity of the '271, wherein the direct row selection can be made without the use of a key (a combination of binary bits) on the CAM side. Transcript at 1140–41. The Court thus finds the Sperry Rand patent does not anticipate Hitachi's '271 patent.

As for the issue of Motorola's infringement of the '271, the Court is of the opinion the MC68030 and specifically the Translation Lookaside Module portion thereof does in fact include the CAM array/RAM array with an interconnecting logic means for selecting and connecting, including the ability to load the CAM array without inputting a key. Defendant's Exhibits 300, 308/D, 308/D1, 320/D, 324/D, Transcript

at 1141–64, Transcript at 1256. Accordingly, it is the finding of this Court Motorola infringed the Hitachi '271 patent with the MC68030.

## DAMAGES

For reasons stated above, the Court is constrained to find damages both for infringements by Hitachi and by Motorola. It is both in making the initial infringement determination and in fashioning the remedy that this Court is made acutely aware of the travesty of justice cases such as this pose upon courts. The subject matter of this suit is extremely complex and delicate; not the sort of thing the lay person should be put in a position of judging. The intricacies of the patents and devices involved is clear only to the engineer. The far-reaching effects of infringement is known only to the business persons and marketing specialists involved with Motorola and Hitachi. What is more perplexing to this Court is these two parties have dealt personally with each other for years. They have negotiated their differences with the skill and expertise only they can possess. Yet suddenly they left behind their prior relationship and expected this Court to ferret out the wrongdoings of which each is accused. Even worse, they hired lawyers to compound and exponentially increase their disputes and damages. This Court has seen more than ninety motions filed in this case, replete with bickering and petty insults. The parties would have saved time, money, feelings, and relations had they curbed their emotions and sat down to settle their difference out of court. In short, this suit is not the sort of thing Federal Courts should spend time and energy upon. The parties present this Court not with legal questions, but with questions related to engineering and electronic technology more suitably determined by those intimately familiar with the art.

With that, the Court shall begin its bewildering foray into the issue of damages. By statute, this Court, in its equitable discretion, may enjoin the use of the infringing device. 35 U.S.C. § 283. Indeed, injunctive relief against an infringer is the norm. *KSM Fastening Systems, Inc., v. H.A. Jones Co.*, 776 F.2d 1522 (Fed. Cir.1985). Further, this Court must award at least reasonable royalty damages to the patentee. 35 U.S.C. § 284.

■ This Court finds herein Hitachi infringed Motorola patents '785, '559 and '945 with its H8 microcontroller. In terms of injunctive relief, this Court must rely on the ancient principles of equity in molding its decision. The historic injunctive process was designed to deter, not punish. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591–2, 88 L.Ed. 754 (1944). Yet any sort of injunctive relief will necessarily punish the wrongdoer as the technology and markets involved herein are so far-reaching that the future harm to the enjoined party shall not and perhaps cannot be measured. At any rate, the Court feels compelled to enjoin the further marketing by Hitachi of the H8 for the duration of the '785, '559 and '945 patents for the reason certain circuitry of the H8 infringes the teaching of those patents and because the H8 is not licensed under the PLA. Likewise, the Court shall Order an injunction of further marketing of the Motorola 68030 device for the duration of the '271 patent.[8]

■ This Court's duty in determining compensatory damages, is to put the patentee in the position it would have held had infringement not occurred. *Weinar v. Rollform Inc.*, 744 F.2d 797 (Fed.Cir.1984). Reasonable royalty is the floor below which damages shall not fall. *Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed.Cir.1983). In this case, the Court found Hitachi did not breach its contract with Motorola. Thus, the United States market is the only relevant forum for reviewing Motorola's infringement damages.

---

**8.** Of the Motorola 68000 family, the 68030 appeared to be the most specific infringing device of the Hitachi '271 patent. Although Hitachi indicates the entire 68000 line of products may have a hand in infringing the '271, the Court is of the opinion a broader injunction is too vague under the circumstances. *See: Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256 (Fed.Cir. 1986).

■ Motorola is clearly not entitled to Hitachi's H8 profits under the prevailing law, although such profits may be used as a yardstick for making the assessment of Motorola's damages. *Stickle v. Heublein,* at 1560; *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895 (Fed.Cir.1986). Now, had the H8, and products utilizing the H8, not been marketed in the United States, Hitachi would not have made some $6,691,000.00 in profits. Plaintiff's Exhibit 582. As this Court is not in a position to conclude Motorola products would have been bought instead of the H8 in each of the purchases underscored by the profits, the Court is of the opinion the entire amount should not be awarded. Instead, the evidence suggests Motorola currently holds approximately 6% of the total market share in the total semiconductor industry. Plaintiff's Exhibit 13. Multiplying Hitachi's profits by Motorola's market share in the industry is, in this Court's opinion, a more accurate measure of damages Motorola suffered by introduction of the H8 into the United States' market. This amount totals $401,460.00, a nominal amount in terms of the net worth of both Motorola and Hitachi. The Court is certain this figure does not come close to the reasonable royalty chargeable to Hitachi for the use of the '785, '559 and '945 patents.

As Motorola tendered no evidence of a reasonable royalty figure or analysis, this Court shall look to the evidence presented by Hitachi with regard to reasonable royalties. Hitachi's expert, Stephen Willis, looked at three areas in determining a reasonable royalty, licensing characteristics in the semi-conductor industry, licensing characteristics of Motorola, and costs associated with available, acceptable non-infringing technology. Defendant's Exhibit 1120. The Court finds the second factor most relevant and significant to a determination of what these parties might have agreed to had the issue been negotiated. According to Hitachi, Motorola entered into at least 62 agreements with Hitachi and other semiconductor manufacturers covering semiconductor technology. Thirteen of those agreements were between Motorola and Hitachi. Forty-six of the agreements include

a lump sum royalty payment, twelve of which were for $500,000.00 or less. Motorola did not produce cross-evidence refuting these numbers. In light of this evidence, the Court is of the opinion a reasonable royalty for each infringed patent is a lump sum of $500,000.00. As Hitachi infringed three of Motorola's patents, the Court is of the opinion a baseline reasonable royalty calculation for all three patents is $1,500,000.00.

The Court shall not stop at this figure, however, because the Court agrees with the prevailing thought that mere recovery of reasonable royalty is analogous to the imposition of a compulsory license upon every patent owner and does not serve to deter such conduct in the future. *See, e.g.: TWM Manufacturing Co. v. Dura Corp.,* 789 F.2d 895 (Fed.Cir.1986). Thus, in addition to reasonable royalty, the Court shall include lost profits to the sum, making the total recovery for Motorola equal to $1,901,460.00 on its infringement claims.

Turning then to the Hitachi '271, the Court is likewise of the opinion Hitachi should recover $500,000.00 as a lump sum reasonable royalty for the infringement of its patent. Unfortunately, the '271 has never been put to market in a microprocessor or otherwise, therefore lost profits, in terms of Motorola 68030 is not relevant to the issue of damages. Further, Hitachi argued reasonable royalty was a proper measure of damages for infringement of the '271. Therefore, the Court shall not assess additional damages against Motorola for infringement of the '271. Thus, the Court assigns a total damage figure to Hitachi of $500,000.00 for Motorola's infringement of the Hitachi '271 patent.

In light of the foregoing,

IT IS ORDERED the H8 is hereby declared *not* licensed under the parties 1986 PLA.

IT IS FURTHER ORDERED Hitachi is enjoined from marketing or selling the H8 microprocessor for the duration of the '785, '559 and '945 patents.

IT IS FURTHER ORDERED Motorola shall recover from Hitachi $1,901,460.00 for

Hitachi's infringement of the Motorola '785, '559 and '945 patents. Post judgment interest in the amount of 8.36% per annum shall accrue upon this figure from the date of this Judgment until the Judgment is paid.

IT IS FURTHER ORDERED Motorola is enjoined from the marketing or sale of the 68030 microprocessor for the duration of the '271 patent.

IT IS FURTHER ORDERED Hitachi shall recover from Motorola $500,000.00 for Motorola's infringement of Hitachi's '271 patent. Post judgment interest in the amount of 8.36% per annum shall accrue from the date of this Judgment until the date the judgment is paid.

IT IS FURTHER ORDERED the parties shall submit affidavits regarding pre-judgment interest within 20 days of the date below.

A separate Judgment shall issue in this case. By separate order, this Court shall make its rulings on Motorola's claims of breach of the confidentiality order entered in this matter.

### ON MOTION FOR CLARIFICATION OR MODIFICATION

BEFORE THIS COURT is the Motion of Hitachi for Clarification and Modification of Order and Judgment. Hitachi seeks modification of three subject areas: (1) the Order and Judgment should reflect its application to the H8/532 and not other members of Hitachi's H8 microprocessor family; (2) the Order and Judgment should clarify the parties are prohibited from "making" or "using" the devices found to infringe in addition to marketing or selling those devices; and (3) the Order and Judgment should reduce the lost profits portion of Motorola's damage award to $50,880. This Court is of the opinion Hitachi's motion should be granted in part. Accordingly,

IT IS ORDERED this Court's Order and Judgment of March 29, 1990 regarding Hitachi's "H8 microprocessor" shall apply only to Hitachi's H8/532 microprocessor and not to any other member of Hitachi's H8 product line.

IT IS FURTHER ORDERED this Court's injunction against Motorola prohibits Motorola from making, using or selling its 68030 microprocessor for the life of Hitachi's '271 patent. Similarly, this Court's injunction against Hitachi prohibits Hitachi from making, using or selling Hitachi's H8/532 microprocessor for the life of Motorola's '785, '559 and '945 patents.

This Court shall issue its written opinion on the subject of damages on June 18, 1990.